IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION


JAMES FERGUSON,                          *

          Plaintiff,                     *

vs.                                      *
                                              CASE NO. 4:03-CV-166(CDL)
GEORGIA DEPARTMENT OF                    *
CORRECTIONS; BONNIE R. KERSEY,
individually and in her official *
capacity; RITA F. MEANS,
individually and in her official *
capacity; and GERALD COLEMAN,
individually and in his official *
capacity,
                                         *
          Defendants
                                         *


O R D E R

     Presently pending before the Court are the following motions:
Defendant Georgia Department of Corrections' Motion for Summary
Judgment (Doc. 62), the Motion to Dismiss filed by Defendants Kersey,
Means, and Coleman (Doc. 63), the Motion for Summary Judgment filed
by Defendants Kersey, Means, and Coleman (Doc. 64), and Defendant
Georgia Department of Corrections' Motion to Strike (Doc. 71).  For
the reasons set forth below, both motions for summary judgment are
granted, and the Motion to Dismiss is granted.  The Court did not
rely on any inadmissible evidence in ruling on these motions, and the
Motion to Strike is therefore denied as moot.

INTRODUCTION

This lawsuit arises out of the alleged disparate treatment, based on race,[1] of Plaintiff by Defendants while Plaintiff was employed by Defendant Georgia Department of Corrections ("GDOC") as a correctional officer at the Columbus Diversion Center under the supervision of Defendants Kersey, Means, and Coleman. Plaintiff contends that he was subjected to a number of adverse employment actions based on his race and that he was also subjected to a hostile work environment because of his race. Plaintiff further asserts that Defendants retaliated against him for making complaints about his treatment. The Georgia Commission on Equal Opportunity ("GCEO") received Plaintiff's complaint of employment discrimination on February 20, 2003, and the U.S. Equal Employment Opportunity Commission ("EEOC") received his complaint on March 4, 2003. Plaintiff received a right to sue letter from the EEOC on August 15, 2003 and filed this lawsuit on November 12, 2003.

Plaintiff brings claims against Defendant GDOC for disparate treatment, hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").[2]   Plaintiff also brings 42 U.S.C. § 1983 ("§ 1983") equal

_____

[1]Plaintiff initially included gender discrimination claims in his Complaint, but he concedes that he failed to include such a charge or facts that would support such a charge in his EEOC complaint. Plaintiff's gender discrimination claims are therefore administratively barred. *See Gregory v. Georgia Dep't of Human Res.*, 355 F.3d 1277, 1279-80 (11th Cir. 2004).

[2]To the extent that Plaintiff has attempted to assert Title VII claims against Defendants Kersey, Means, and Coleman in their official capacities, such claims are actually claims against Defendant GDOC. *See, e.g., Hobbs v. Roberts*, 999 F.2d 1526, 1530 (11th Cir. 1993) ("Official capacity suits are suits against state agencies, not against the people through whom agencies act."). Plaintiff's Title VII claims against Defendant GDOC are addressed *infra*. Any Title VII claims which Plaintiff has attempted to

protection claims against Defendants Kersey, Means, and Coleman in their official and individual capacities for disparate treatment, hostile work environment, and retaliation.  Plaintiff attempts to assert claims against Defendants under 42 U.S.C. § 1981 ("§ 1981") by including, for the first time, such claims in his Response to Defendant's Motion for Summary Judgment.  However, Plaintiff did not make a § 1981 claim in his Complaint or his Amended Complaint, and he has not sought leave of the Court to amend his Complaint to include such a claim.  To the extent that Plaintiff's Response to Defendant's Motion for Summary Judgment is a Motion for Leave to Amend Plaintiff's Complaint, that motion is denied.[3]

Defendants Kersey, Means, and Coleman move to dismiss Plaintiff's § 1983 claims against them in their official capacities, contending that the Court lacks subject matter jurisdiction over the claims and that Plaintiff has failed to state a claim upon which relief can be granted.  Defendant GDOC's Motion for Summary Judgment challenges the merits of Plaintiff's claims, contending that Plaintiff has failed to meet his burden of establishing disparate treatment, hostile work environment, or retaliation in violation of Title VII.  Finally, Defendants Kersey, Means, and Coleman move for

---

assert against Defendants Kersey, Means, and Coleman in their *individual* capacities are inappropriate and are dismissed because Title VII grants relief against an *employer*, not individual employees whose actions would constitute a violation of the Act.  *Hinson v. Clinch County, Ga. Bd. of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000).

[3]Even if the Court considered any § 1981 claims asserted by Plaintiff, these claims would fail for the same reasons that his claims under Title VII and § 1983 fail, *see infra*.  *See, e.g., Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (noting that Title VII and § 1981 "have the same requirements of proof and use the same analytical framework").

3

summary judgment on Plaintiff's § 1983 claims against them in their individual capacities, asserting that they are entitled to qualified immunity.

BACKGROUND FACTS

Construing the record in Plaintiff's favor reveals the following.[4]  Plaintiff, a black male, was employed by Defendant GDOC for sixteen years.  From 1988 to 1998, he was a correctional officer at Rutledge State Prison.[5]  In 1998, Plaintiff began working as a correctional officer at the Columbus Diversion Center ("CDC"), a residence similar to a half-way house for approximately 76 male probationers whose probation has been revoked by a court.  Plaintiff worked at the CDC from June 1998 until September 29, 2004, when his employment was terminated.  Plaintiff alleges that during the course of his employment, he was subjected to racially discriminatory discipline, rejected for a promotion because of race, and subjected to a hostile work environment based on race.  He also claims that he

---

[4]On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Fact issues must have a "real basis in the record" to be considered genuine.  *Mize v. Jefferson City Bd. Of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).  Mere conclusions, unsupported factual allegations, and statements in affidavits based on information and belief (and not personal knowledge) are not sufficient to raise genuine issues of material fact and thus cannot defeat a motion for summary judgment.  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).  Although the record in this case must be construed in the light most favorable to Plaintiff, the Court could not consider as genuine facts any statements proffered by Plaintiff which were mere conclusions, unsupported factual allegations, or affidavit assertions not based on personal knowledge.

[5]While at Rutledge, Plaintiff was issued a letter of reprimand in May 1991 for failing to follow count procedure.  And in February 1998, he was subjected to a three-month salary reduction for failure to properly maintain a count of all inmates and for submission of an incorrect count.

was terminated in retaliation for protected activity.   The factual basis for each of these claims is set forth below.

*1. Plaintiff's Supervisors*

At all times relevant to this lawsuit, Defendant Bonnie Kersey, a white female, was Superintendent of the CDC.  As Superintendent, Kersey was responsible for managing the CDC, which included, *inter alia*, indirectly supervising all CDC employees.  Kersey directly supervised the Assistant Superintendent, who at all times relevant to this lawsuit was Defendant Rita Means, a white female.  The Assistant Superintendent was responsible for supervising the Sergeant and for indirectly supervising the other CDC employees in the Superintendent's absence.  During the time period relevant to this lawsuit, there were two Sergeants:  Dennis Stoner served as Sergeant until June 2002, and Defendant Gerald Coleman, a white male, began as Sergeant in September 2002.  The Sergeant provided direct supervision of the correctional officers, although during the time period when there was no Sergeant (June 2002 to September 2002), Defendant Means provided direct supervision of the correctional officers.

*2. Disciplinary Actions Against Plaintiff*

Disciplinary actions against correctional officers for failing in their duties are recommended by the Superintendent (Defendant Kersey) after consultation with the Sergeant, Assistant Superintendent, and GDOC Legal Services.  In determining what, if any, disciplinary action to recommend, the Superintendent and the Assistant Superintendent consider the correctional officer's prior disciplinary history, among other things.  The ultimate decision to take disciplinary action against a correctional officer is made by GDOC Legal Services and the GDOC Commissioner Designee for Adverse

Action, and this decision is based upon the Superintendent's recommendation.

As a correctional officer at the CDC, one of Plaintiff's main job duties was to maintain an accurate count of the CDC residents. During the course of his tenure at the CDC, Plaintiff was disciplined on two separate occasions for failure to maintain a proper count. First, in March 2001, Plaintiff received a five percent salary reduction for six months following the escape of a resident while Plaintiff was on duty.[6]  Plaintiff was disciplined for that escape because he had conducted an improper count—he counted the resident as being in bed for three counts, 23:30, 01:00, and 03:00, although the resident had escaped from the CDC at 21:45.  Second, Plaintiff received a five percent salary reduction in January 2003.  The recommendation for this salary reduction was initially made on August 15, 2002, and it was based upon two separate incorrect counts: one failure to follow proper count procedures in July 2002[7] and one incorrect count in August 2002.  While the paperwork for the salary reduction was pending, Plaintiff submitted an additional incorrect count in December 2002, and all three incorrect counts were grouped together and resulted in the January 2003 salary reduction.

---

[6]CDC correctional officers are not disciplined every time there is an escape.  Officers are only disciplined when the escape results because an officer failed in his duty, e.g. because he conducts an incorrect count or fails to maintain a secured door.

[7]This incorrect count was the result of failing to enter the location of a resident on the official count form for three counts in one day. Initially, Plaintiff was merely counseled for this incorrect count, although the salary reduction was recommended after the August 2002 incident.

*3. Failure to Promote Plaintiff*

In August 2002, the Sergeant position at the CDC became vacant. Defendant Kersey chose three individuals to serve on the Selection Board for the position: Marty Allen (white male), Fran Jones (white female), and James Smith (black male). Four candidates applied for the Sergeant position: Harry Grier (black male), Gerald Coleman (white male), Michael Cannon (black male), and Plaintiff. The Selection Board interviewed the candidates and selected a numerical score to rate each candidate's answers. After the candidates' scores were tabulated, the candidates were ranked. Grier ranked first, followed by Cannon and Coleman, who tied for second. Plaintiff ranked last. Because two of the top three candidates tied, all four candidates proceeded to the next step: an interview with the Interview Panel, which consisted of Defendant Kersey, Defendant Means, and Chuck Bass, the GDOC State Center Operations Director.

The Interview Panel considered the candidates' experience and history, as well as the Selection Board's ranking, in determining who would receive the Sergeant position. Based on these factors, Grier was the Interview Panel's first choice for the CDC Sergeant position, but they learned that he had recently agreed to a voluntary demotion from a Sergeant position to a correctional officer position due to an incident that occurred during his employment at Rutledge State Prison. Based on that recent demotion, the Interview Panel considered the remaining three candidates. At the time of the interview, Plaintiff had thirteen years of experience as a GDOC correctional officer. He had never been a Sergeant, and he had one letter of reprimand, two previous salary reductions, and one pending salary reduction. Cannon also had a disciplinary history: he had

7

been demoted on two separate occasions at another GDOC facility. Coleman, on the other hand, had no disciplinary adverse actions.[8] Coleman also had seven years of experience as a GDOC correctional officer, two and a half years of which he served as a Sergeant at two GDOC institutions.  Although Coleman took a voluntary demotion from Sergeant when he transferred to the CDC two months before the CDC Sergeant job opening, Coleman took this voluntary demotion so that he could move back to the Columbus area, not because of an incident that occurred during his employment.  After comparing the candidates, the Interview Panel selected Coleman for the Sergeant position because he had no disciplinary history and because he had previously served as a Sergeant at two GDOC institutions.

*4. Hostile Work Environment*

During the course of his employment at the CDC, Plaintiff observed or was subjected to a number of practices which he contends constitute a hostile work environment.  Defendant GDOC developed a Statement Prohibiting Unlawful Harassment ("Statement"), which was promulgated to GDOC employees, including Plaintiff.  That Statement prohibits "verbal, electronic, written or physical conduct that disparages or shows hostility or aversion toward an individual because of that person's race, color, religion, gender, national origin, age or disability."  The Statement requires employees to

---

[8]Plaintiff contends that Coleman did have a disciplinary history because he received a letter of instruction stemming from an incident at another GDOC institution.  As to that incident, an Internal Affairs investigation was completed, and no adverse action was taken against Coleman.  Plaintiff has pointed to nothing which would indicate that a letter of instruction is as serious as a salary reduction or demotion, and there is evidence that Defendant Kersey did not consider a letter of instruction to be a disciplinary adverse action.

report all events of unlawful harassment to "any supervisor in the chain of command" or to the Division Director, Human Resources, the Department Personnel Director, the Assistant Personnel Director for EEO and Diversity Management, the Director of Professional Standards, or the Personnel Duty Officer.  The Statement provided a telephone number for each of the named positions.  Plaintiff did not report unlawful harassment using the GDOC internal procedures outlined in the Statement, and he did not tell Defendant Kersey or Defendant Means that he thought he was being treated differently because of race.  Plaintiff contends that he was reluctant to complain because he feared retaliation.

The practices to which Plaintiff objects include the following:

*Leave Denials*.[9]  Plaintiff requested but was denied leave on several occasions while employed at the CDC.  Plaintiff also requested and was granted leave on several occasions while employed at the CDC.  The evidence also shows that white employees requested but were denied leave on occasion.  Plaintiff perceived that the leave approval process was different for black employees and white employees:  according to Plaintiff, white employees generally received quick approval of their leave requests, while black employees were denied leave altogether or did not receive quick approval of their leave requests.  On one occasion, Plaintiff's supervisor lost Plaintiff's leave request but did not lose the leave request of a white employee that was submitted on the same day.  In

---

[9]At the CDC, whether and when a leave request is granted depends on a variety of factors, including staff and shift coverage, the date the request is received by the decision-maker and the decision-maker's workload at the time, any special operational needs on the requested dates, and the purpose of the leave.

addition, on several occasions Plaintiff was required to make arrangements to have someone else cover his shift when he requested leave.  And on one occasion, Defendant Kersey sent Plaintiff a memo advising him that his leave request had been approved.  The memo was also sent to the two officers who were scheduled to take Plaintiff's shifts to alert them to the change.

*"Working Off" Missed Time.*  Plaintiff asserts that white officers were allowed to make up time away from work without using annual leave or sick leave.  He also asserts that black officers, including himself, were not allowed to make up time away from work in a similar manner.  However, Plaintiff admits that he never asked if he could "work off" time away from work without taking leave.

*Meetings With Supervisors.*  Plaintiff claims that he was never able to have a one-on-one conference with his supervisor and that when he met with his supervisor, both Defendant Means and Defendant Kersey attended those meetings.  Plaintiff asserts that white employees were not subject to the same practice.  There is unrebutted evidence that disciplinary meetings for all CDC employees generally included the following individuals:  the officer, the Sergeant, the Assistant Superintendent, and the Superintendent.

*"Meets Expectations" Ratings.*  Plaintiff contends that he and other black employees never received "Exceeds Expectations" ratings at the CDC but that white employees routinely did.  In his deposition, Plaintiff testified that he believed that several white employees received "Exceeds Expectations" ratings, although he did not see any of their performance evaluations.  Plaintiff presented a "Salary Increase Sheet," which shows that he received an overall "Exceeds Expectations" rating in July of 1998, his first year at the

10

CDC.[10]  He also presented two "Salary Planning Tool" sheets, which show that he received an overall "Meets Expectations" rating in two other years at the CDC.  Although these worksheets contain a list of the CDC employees, nothing on the worksheets indicates the race of each employee, and there is not enough other evidence for the Court to determine this information.  The evidence does not indicate what, if any, impact a higher rating had on an employee's employment.

*Promotable Candidates List*.  In March 2000, the State Director of Diversion and Transition Centers requested that all superintendents, including Defendant Kersey, develop a list of promotable candidates.  From the evidence, the purpose and impact of the list is not entirely clear.  Plaintiff believes that information about the list was disseminated to white employees but not to black employees, that neither he nor any other black employees were included on the promotable candidate list, and that white employees were included on the list.  However, Plaintiff did not see the list, and he does not know whether any CDC employees, white or black, were included on the list or informed about it.

*P.O.S.T. Certification Issue*.  Plaintiff received a letter in or around October 2002 informing him that his Peace Officer Standards and Training ("P.O.S.T.")[11] certification was in jeopardy due to the 2001 escape.  Plaintiff asserts that he received this letter approximately one week after a white CDC employee, Mr. Stoner, stopped by Plaintiff's home to drop off some paperwork and saw

---

[10]Plaintiff contends, however, that this rating was largely for his work at the prior facility.

[11]P.O.S.T. and the Department of Corrections are separate agencies.

Richard Mack, a black CDC employee who had filed a lawsuit against Defendant GDOC, visiting with Plaintiff.   Plaintiff contends that there was a connection between his association with Mr. Mack and the letter regarding his P.O.S.T. certification:   Plaintiff believes Defendant Kersey either knew or once worked with some people at the P.O.S.T. office and that is why his P.O.S.T. certification was in jeopardy.   There is no evidence that Mr. Stoner told Defendant Kersey that he saw Mr. Mack at Plaintiff's home.   And there is no evidence that Defendant Kersey spoke with anyone at P.O.S.T. regarding his certification, but he "found it strange" that he would receive such a letter more than a year after the escape incident but shortly after meeting with Mr. Mack in his home.

*Phone Calls/Visit During FMLA Leave.*   Plaintiff took leave under the Family and Medical Leave Act ("FMLA") in the fall of 2002.   While Plaintiff was on leave, Mr. Stoner, a white employee, hand delivered some FMLA paperwork to Plaintiff at his home so that Plaintiff could complete and return it.   Plaintiff considered this to be harassment because Mr. Stoner did not call before he stopped by Plaintiff's house.   In addition, Plaintiff received a telephone call from someone at the CDC every day or every other day, asking him how he was doing and when he would complete and return his FMLA paperwork.   Plaintiff eventually requested and received an explanation, in the form of a standard operating procedure document, as to why he had to complete the paperwork.   Once Plaintiff understood the importance of the paperwork, he completed it and returned it.   During his FMLA leave, Plaintiff also received calls from CDC employees asking when he would return to work.

*"Smile For You" Poster.*  While Plaintiff was employed at the CDC, there was a poster of a smiling gorilla hanging on the bathroom door.  The poster was titled "Smile For You" and contained the following poem:

> Smiling is infectious; you catch it like the flu,
> When someone smiled at me today, I started smiling too.
> I passed around the corner and someone saw my grin
> When he smiled I realized I'd passed it on to him.
> I thought about that smile then I realized its worth,
> A single smile just like mine could travel round the earth.
> So, if you feel a smile begin, don't leave it undetected
> Let's start an epidemic quick, and get the world infected!
> Keep the smile going by sending this on to a friend,
> Everyone needs a smile!!!

There are no racial comments on the poster.  Plaintiff found the poster racially offensive because it contained a picture of a gorilla.  There is no other evidence regarding the poster or the circumstances under which it was placed on the bathroom door.

*Treatment of Residents.*  Plaintiff first contends that on one or two occasions, outside of Plaintiff's presence, a white resident of the CDC used a racial slur against Richard Mack, a black employee, but went unpunished.  Second, Plaintiff asserts that white residents were treated more favorably than black residents in terms of

discipline,[12] release date,[13] transportation[14] and visitation.[15] Finally, Plaintiff claims that there was a bulletin board in the kitchen area of the CDC which contained photographs of a number of black residents who failed the program. He asserts that the bulletin board did not contain the photographs of white residents who failed the program. However, the evidence submitted by Plaintiff shows that at one time, the bulletin board contained photographs of four black residents and one white resident.

*Name-Calling*. Officer Mitchell, one of Plaintiff's white coworkers, called Richard Mack, a black man, a "sorry son of a bitch," once in front of Plaintiff. On another occasion, Officer Gilyard told Plaintiff that Officer Mitchell had called Plaintiff a "sorry joker." Plaintiff does not know if Defendant Kersey was made aware of either statement.

*Supervision*. Plaintiff also contends that black employees were treated differently in their supervision than white employees and that the supervisors allowed an "atmosphere of racial discrimination"

---

[12]Resident discipline depends on the following factors: resident's disciplinary history; nature of the offense; amount of time between the resident's previous disciplinary action and the current offense; severity of the previous disciplinary action; and whether the resident has other related issues, such as mental health issues.

[13]Release date factors include the terms of the court's order, whether the resident has followed the terms of the court order, the resident's disciplinary record at the CDC, and whether the resident has a physical or mental condition that requires transfer to another facility.

[14]Whether a resident will be transported outside the CDC for medical appointments, job interviews, etc. depends on factors including the availability of staff to transport the resident.

[15]Whether a resident's application for visitation by immediate family is approved depends on a number of factors, including whether the visitor is "immediate family," whether there are court orders restricting visitation, and whether the resident has lost visitation privileges.

against black employees and residents to exist at the CDC.  Other than the alleged problems discussed *supra*, Plaintiff did not provide any additional examples to support this contention.

*5. Plaintiff's Termination*

Plaintiff filed this lawsuit against Defendants in November 2003.  In June 2004, through discovery, Plaintiff produced a number of GDOC documents, including official CDC resident count sheets, resident statements, resident financial information, incident reports, and staff statements.  Defendant Kersey considered these documents to be confidential, and neither she nor the GDOC had authorized their release to Plaintiff.  The GDOC Special Investigations Unit conducted an official investigation regarding the documents based on possible misuse of state property and improper release of confidential information.  In the course of this investigation, Plaintiff and other CDC employees were interviewed.  As a condition of their employment, GDOC employees are required to cooperate fully with any official investigation.  Plaintiff signed an Acknowledgment Statement to acknowledge that a violation of the Employee Standards of Conduct, such as failure to cooperate fully with any investigation, may be the basis for disciplinary action, including dismissal.

Plaintiff was first interviewed for the investigation regarding the documents on September 9, 2004.  When asked what he knew about documents being taken out of the CDC, Plaintiff told the investigator that he "could not make any comments about anything to do with [his] lawsuit" and that he was "willing to cooperate as long as it did not have anything to do with [his] lawsuit."  The investigator then asked Defendant Kersey to join him, and Plaintiff reiterated the same

position—if the investigator and Kersey wanted to ask Plaintiff anything "that was not dealing with the lawsuit," he would talk to them about it.   At that point, the investigator terminated the interview, believing that Plaintiff was refusing to cooperate.

After that first interview, Defendant Kersey sent Plaintiff a letter directing him to be present on September 14, 2004 and to cooperate in the investigation.   When the investigator began to question Plaintiff on September 14, Plaintiff indicated again that he would not answer questions about his lawsuit.   The investigator terminated the interview, believing that Plaintiff was refusing to cooperate.   Based on her observation of Plaintiff's conduct during the two interviews, Defendant Kersey believed that Plaintiff was not cooperating in the internal investigation regarding the leak of the confidential documents.   Therefore, she suspended Plaintiff with pay on September 14, 2004.   Plaintiff's employment was terminated on September 29, 2004.

DISCUSSION

1. *Motion to Dismiss*

Defendants Kersey, Means, and Coleman move to dismiss Plaintiff's § 1983 claims against them in their official capacities, arguing that such claims are claims against an agency of the State of Georgia, which is not a "person" capable of being sued under § 1983, and that the claims are barred by the Eleventh Amendment.   Official capacity suits for damages against employees of a state agency are suits against the state agency. *Hobbs v. Roberts*, 999 F.2d 1526, 1530 (11th Cir. 1993).   A suit against a governmental entity which is considered an "arm of the state"—such as the GDOC—is a suit against

16

the State. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989); *see Miller v. King*, 384 F.3d 1248, 1259 (11th Cir. 2004) (noting that § 1983 actions for damages against GDOC are barred because GDOC is not person capable of being sued under § 1983 and because of Eleventh Amendment immunity).  And neither a State nor its officials acting in their official capacities are "persons" under § 1983, which provides a cause of action only against "persons" who, under color of state law, deprive an individual of his constitutional rights. *See* § 1983; *see Will*, 491 U.S. at 71.  Furthermore, the Eleventh Amendment to the United States Constitution bars a § 1983 action against the State of Georgia and the GDOC unless the State either consents to suit or waives its sovereign immunity with regard to § 1983 claims—neither of which has happened here. *See Miller*, 384 F.3d at 1260.  For these reasons, Plaintiff's claims for damages under § 1983 against Defendants Kersey, Means, and Coleman in their official capacities are not asserted against "persons" within the meaning of § 1983, and they are barred by the Eleventh Amendment. Accordingly, these claims are dismissed.[16]

---

[16]The Court notes that § 1983 suits for prospective relief against public officials are *not* treated as actions against the State, so a state official sued for *injunctive* relief in his official capacity *would* be considered a "person" under § 1983. *See Will*, 491 U.S. at 71 n.10. Furthermore, such actions for prospective relief are not barred by the Eleventh Amendment. *Miller*, 384 F.3d at 1260. To the extent that Plaintiff in the instant case asserts § 1983 claims for injunctive relief against the individual Defendants in their official capacities, such claims—which are based upon the same conduct attacked under Plaintiff's Title VII claims—consist of the same elements and are subject to identical methods of proof as Plaintiff's Title VII claims. *See Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995).  For the same reasons Defendant GDOC is entitled to summary judgment on Plaintiff's Title VII claims, *see infra*, Defendants Kersey, Means, and Coleman are entitled to summary judgment as to Plaintiff's § 1983 claims for injunctive relief against them in their official capacities.

*2. Summary Judgment Motions*

Defendants are entitled to summary judgment if after construing the evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in his favor, no genuine issues of material fact remain to be tried.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*a. Defendant GDOC's Summary Judgment Motion*

Plaintiff's claims against Defendant GDOC are based on alleged violations of Title VII of the Civil Rights Act of 1964.  Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  When a plaintiff offers circumstantial evidence to prove a Title VII claim, the claim is analyzed under the analytical framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).[17]  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998).  Under this framework, the plaintiff must establish a prima facie case of discrimination.  This creates a rebuttable presumption that the employer unlawfully discriminated against the employee because it eliminates the most common reasons for the challenged employment

---

[17]The Court notes that Plaintiff in his response brief indicated that he has a direct evidence theory in this case.  However, Plaintiff did not elaborate as to what exactly this theory is or what evidence he believes constitutes direct evidence—evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption, *see Standard*, 161 F.3d at 1330—and the Court can discern none from the record.

action.  *McDonnell Douglas*, 411 U.S. at 802; *Texas Dep't of Cmty.*
*Affairs v. Burdine*, 450 U.S. 248, 253 (1981)*; Chapman v. AI*
*Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  If the
plaintiff establishes a prima facie case, the burden shifts to the
employer to articulate a legitimate, nondiscriminatory reason for the
challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802;
*Burdine*, 450 U.S. at 254*; Chapman*, 229 F.3d at 1024.  The employer's
burden at this point is a burden of *production*—the employer must
"clearly set forth, through the introduction of admissible evidence,
the reasons for the [challenged employment action]." *Burdine*, 450
U.S. at 255.  If the employer meets its burden of production, the
presumption raised by the prima facie case is rebutted, and to avoid
summary judgment the plaintiff must come forward with evidence,
including evidence establishing the prima facie case, sufficient to
create a "genuine issue of material fact regarding whether *each* of
the defendant employer's articulated reasons" is pretext for
discrimination.  *Chapman*, 229 F.3d at 1024, 1037; *see also Burdine*,
450 U.S. at 255-56.  Although a plaintiff cannot prove that the
proffered reasons were pretext for discrimination simply by showing
that the reasons were false, rejection of the employer's proffered
reasons will in some cases permit an inference of discrimination.
*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993); *Reeves v.*
*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("In
appropriate circumstances, the trier of fact can reasonably infer
from the falsity of the explanation that the employer is dissembling
to cover up a discriminatory purpose.").

*i. Discriminatory Discipline*

Plaintiff contends that he was subjected to discriminatory discipline when his salary was reduced in January 2003.[18]  According to Defendant, this disciplinary action was based upon three incorrect counts:  one failure to follow proper count procedure in July 2002, one incorrect count in August 2002, and one incorrect count in December 2002.  The problem with the July 2002 count was failure to enter the location of a resident on the official count.  The problem with the August 2002 and December 2002 counts involved the use of white-out correctional fluid on a count sheet—a prohibited practice.  Plaintiff denies using the white-out and claims that someone else must have done it.  He further contends that even if he had used white-out to alter the counts, several white officers used white-out on count sheets but were not disciplined.

To establish a prima facie case of disparate discipline, Plaintiff must show that he (1) was a member of a protected group, (2) engaged—either disputedly or admittedly—in misconduct similar to

---

[18]Plaintiff also raised the March 2001 salary reduction.  To the extent that Plaintiff attempts to base a discriminatory discipline claim on this incident, it is barred because he did not timely file a charge of discrimination with the GCEO or the EEOC regarding it.  *See* 42 U.S.C. § 2000e-5(e)(1) (aggrieved person who initially institutes proceedings with State agency with authority to grant relief—such as GCEO—must file EEOC charge within three hundred days after the alleged unlawful employment practice occurred or within thirty days after receiving notice that the State agency has terminated the proceedings, whichever is earlier).  And to the extent that this incident is relevant on some other issue, the Court notes that Plaintiff has not shown that race was a factor in the decision to discipline him for the escape.  Although he has pointed to several white officers who were on duty when an escape occurred, Plaintiff has pointed to no evidence that these officers were similarly situated in all relevant respects to him or that their conduct was similar to his.  Moreover, even if he had shown that the other officers were similarly situated to him, Plaintiff has not shown that these other officers were treated more favorably than him.

persons outside the protected group, and (3) was disciplined more severely for that misconduct than similarly situated persons outside the protected group. *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 n.6 (11th Cir. 1998), *modified on other grounds in* 151 F.3d 1321 (11th Cir. 1998). The burden is on Plaintiff to show that a white employee who was similarly situated to him in all relevant respects engaged in the same or similar conduct but was disciplined differently than him. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Plaintiff contends that white officers submitted counts with white-out alterations but were not disciplined for that conduct. To this point, Plaintiff asserts that there were "numerous occasions" of impermissible white-out use by white officers. However, Plaintiff has pointed the Court to evidence of only one such occasion—a copy of a count sheet on which Gerald Coleman, a white officer, allegedly used white-out.[19] Even if the Court were to find that this evidence shows that Coleman committed one white-out violation, Plaintiff has not shown that Coleman committed two white-out violations and an additional failure to follow proper count procedure violation, that Coleman's prior disciplinary history was similar to Plaintiff's or that Coleman was treated more favorably than Plaintiff with regard to this conduct. For these reasons, the Court finds that Plaintiff has not made out a prima facie case of disparate discipline.

---

[19]The exhibit submitted to the Court is a copy, and it is impossible to tell whether white-out was actually used on the original. Plaintiff represents that it was, and the Court assumes for the purpose of this analysis that it was.

Accordingly, Defendant GDOC is entitled to summary judgment on this claim.[20]

### ii. Failure to Promote

Plaintiff also claims that he was not promoted to the Sergeant position because of race.  To establish a prima facie case of promotion discrimination, Plaintiff may show that (1) he was a member of a protected group, (2) he applied for and was qualified for the position in question, (3) he was not given the promotion, and (4) someone outside the protected group was given the promotion. *Walker v. Mortham*, 158 F.3d 1177, 1186, 1193 (11th Cir. 1998).[21]  The

_____

[20]There is evidence, in the form of Plaintiff's statement, that Plaintiff did not actually use white-out on the count sheets. Even if this is enough to make out a prima facie case of disparate discipline, Defendant GDOC has articulated a legitimate non-discriminatory reason for the discipline which Plaintiff has failed to show is pretextual. *See Jones v. Gerwens*, 874 F.2d 1534, 1540 (1989) (noting that a plaintiff makes out a disparate discipline prima facie case if he establishes that he was a member of a protected group, that he was disciplined for a work rule violation and either (a) that he did not commit the work rule violation for which he was disciplined or (b) that he engaged in conduct similar to that of a person outside of the protected group but was disciplined more severely).  There is undisputed evidence that Defendants Kersey and Means honestly believed that Plaintiff was responsible for the incorrect count because Plaintiff admitted to them that he had to "own the count" since he signed the count sheets in question.  Furthermore, there is no evidence that any similarly situated white employee admitted responsibility for a count sheet containing white-out alterations but was not disciplined.

[21]In *Walker*, an Eleventh Circuit panel addressed an intracircuit split regarding the prima facie case in failure to promote cases.  Prior to *Walker*, some Eleventh Circuit opinions, relying upon *Crawford v. Western Elec. Co.*, 614 F.2d 1300, 1315 (5th Cir. 1980), defined the failure to promote prima facie case as described *supra*.  *See Walker*, 158 F.3d at 1186, 1193.  However, other Eleventh Circuit opinions, relying upon *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 n.7 (11th Cir. 1983), defined the fourth prong of the prima facie as including a requirement that the plaintiff show that the employee who received the promotion was equally or less qualified than the plaintiff.  The *Walker* court applying the "earliest case" rule, followed the *Crawford* rule, and specifically held that a plaintiff need not prove relative qualifications to establish a failure to promote prima facie case.  *Walker*, 158 F.3d at 1193.  Despite the *Walker*

22

Court is satisfied that Plaintiff has made out a prima facie case of promotion discrimination.

To rebut Plaintiff's prima facie case, Defendant GDOC articulated a legitimate nondiscriminatory reason for its decision to promote Coleman instead of Plaintiff:  Coleman was better qualified because he had experience as a Sergeant and because he had no disciplinary adverse actions.  Plaintiff must therefore come forward with evidence sufficient to create a genuine issue of material fact regarding whether that articulated reason is pretext for discrimination.  *See Chapman*, 229 F.3d at 1024, 1037.  Plaintiff attempts to show pretext in two ways.  First, he claims, essentially, that the Interview Panel was not consistent in its decision-making process.  Plaintiff argues that, although the Interview Panel viewed Coleman's disciplinary history as clean, it was not:  Coleman had received a letter of instruction.  However, Plaintiff has not shown that a letter of instruction is an adverse action on par with a salary reduction or demotion—and there is evidence that Defendant Kersey did not view letters of instruction to be adverse actions because they are not kept in an employee's personnel file.  Plaintiff also makes much of the fact that Coleman took a voluntary demotion—the exact same consideration, he argues, that took Grier out of the front-runner position.  However, the two situations are

---

court's exhaustive discussion of the issue, Eleventh Circuit panels have continued to apply the *Perryman* rule—without addressing the intracircuit split issue or even citing *Walker* on this point. *See, e.g., Denney v. City of Albany*, 247 F.3d 1172, 1183 (11th Cir. 2001); *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000); *Taylor v. Runyon*, 175 F.3d 861, 866 (11th Cir. 1999).  However, this Court finds, based on *Walker*, that *Crawford* controls and therefore applies the failure to promote prima facie case standard enunciated in that case.

clearly distinguishable. Grier took a voluntary demotion as a result of a work-related incident at Rutledge State Prison, and Coleman took a voluntary demotion so that he could move back to the Columbus area. Therefore, the Court cannot find, as Plaintiff suggests, that the Interview Panel was inconsistent in its decision-making process.

Second, Plaintiff claims that he was better qualified for the position because he had been employed by GDOC for thirteen years, compared to Coleman's seven. It is true that Plaintiff may establish pretext by demonstrating that he was better qualified for the position than Coleman. *See Ash v. Tyson Foods, Inc.*, 126 S. Ct. 1195, 1197 (2006). To do this, he must show that he was clearly the superior candidate—that the disparities in qualifications are of such weight and significance that no reasonable person could have chosen Coleman over Plaintiff for the Sergeant position. *See Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004); *see also Ash*, 126 S. Ct. at 1197 (disapproving of Eleventh Circuit's previous "slap you in the face" standard for inferring pretext from superior qualifications as unhelpful and imprecise but suggesting that "weight and significance"/"reasonable person" standard is acceptable). In this case, although Plaintiff had been a correctional officer longer than Coleman, Coleman had held a Sergeant position for two and a half years before, and he had a better disciplinary history than Plaintiff. Based on this evidence, the Court cannot find that Plaintiff has shown that he had superior qualifications. Therefore, the Court finds that Plaintiff has not carried his burden of showing pretext. Accordingly, Defendant GDOC is entitled to summary judgment on Plaintiff's failure to promote claim.

24

### iii. Hostile Work Environment

Plaintiff further contends that he was subjected to a hostile work environment based on his race.  To make out a prima facie case of hostile work environment racial harassment, Plaintiff must show (1) that he belongs to a protected group, (2) that he was subjected to unwelcome racial harassment, (3) that the harassment was based on his race, (4) that the harassment "'was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment,'" and (5) a basis for holding Defendant GDOC liable.  *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc)) (sexual harassment case).

### 1. Alleged Harassment Not "Based On" Race

In this case, Plaintiff has alleged a variety of practices he considers to be harassment.  However, for the most part, Plaintiff has provided no evidence from which a reasonable factfinder could conclude that alleged harassment was based on race.[22]

*Leave Denials*.  The evidence shows that some of Plaintiff's leave requests were granted, while others were denied.  The evidence also shows that the leave requests of white employees were sometimes granted and sometimes denied.  To the extent that Plaintiff alleges a different approval process for black employees and white employees, there is no evidence that Plaintiff was treated differently than similarly situated white employees with regard to his leave

---

[22]One way for Plaintiff to show that the alleged harassment was based on race is to show that he was treated differently than a similarly situated white employee.  The burden is on Plaintiff to establish this disparate treatment.  *See Holifield*, 115 F.3d 1562.

requests—there is no evidence that Plaintiff made but was denied a leave request under circumstances that were similar to or the same as the circumstances under which a white employee made and was granted a leave request.[23]   Likewise, there is no evidence that only Plaintiff had to make arrangements to have someone else cover his shift on some occasions when he took leave—Plaintiff has pointed to no evidence showing that white employees who took leave under similar circumstances did not also have to find a replacement.   As for the memo which granted Plaintiff's leave and informed the two replacement officers of the shift change, the only evidence that such a memo was "unusual" is Plaintiff's opinion.   Granted, Plaintiff did opine that the memo was unusual because he was not aware of any similar memos to his white colleagues, but there is nothing in the record to suggest a white employee requested and was granted a schedule change under similar circumstances and was not sent such a memo, with a copy to his replacements.   For these reasons, the Court cannot find that Plaintiff has shown a genuine issue of material fact on the question whether decisions with regard to his leave requests were made based on his race.

*"Working Off" Missed Time.*   The evidence shows that white officers were sometimes allowed to make up time away from work without using annual leave or sick leave.   Plaintiff asserts that he was never allowed to make up time away from work in a similar manner.

---

[23]Plaintiff did assert that his supervisor once lost his leave request but did not lose the request of a white employee that was submitted on the same day.   However, Plaintiff has pointed the Court to no evidence tending to show that this was intentional.   There is no evidence that the two leave request forms were given to the supervisor in the same manner and under similar circumstances, and it would be speculation for the Court to assume that they were.

There is no evidence that white officers were specifically told that the could "work off" missed time or that permission to "work off" time was granted for white employees in the absence of a request for such permission.  Plaintiff never asked if he could "work off" time away from work without taking leave.  Therefore, the Court cannot find that any decision not to let Plaintiff "work off" time was based on Plaintiff's race.

*Meetings With Supervisors.*  According to Plaintiff, he was never able to have a one-on-one conference with his supervisor.  Rather, when he met with his supervisor, both Defendant Means and Defendant Kersey attended those meetings.  Plaintiff did not specify what type of one-on-one conference he expected to be able to have with his supervisor.  There is evidence that disciplinary meetings generally included the following individuals:  the officer, the Sergeant, the Assistant Superintendent, and the Superintendent.  There is no evidence that white employees and black employees were not treated the same with regard to disciplinary conferences.  As to conferences on other topics, Plaintiff has pointed the Court to no evidence that he requested but was refused a one-on-one conference or that white employees were allowed to have such one-on-one conferences.  For these reasons, the Court cannot find that the lack of one-on-one conferences with a supervisor was based on Plaintiff's race.

*"Meets Expectations" Ratings.*  The evidence shows that Plaintiff received an "Exceeds Expectations" rating at the CDC in 1998 but that he received a "Meets Expectations" rating during the subsequent years of his employment there.  Although there is some evidence that several white officers received "Exceeds Expectations" ratings during two of the years when Plaintiff did not, Plaintiff has pointed the

Court to no evidence that these other officers were similarly situated to Plaintiff in terms of their performance, particularly with regard to disciplinary actions or counseling sessions. Furthermore, to the extent that Plaintiff attempts to show a statistical disparity between the ratings of white employees and black employees, his evidence is insufficient to do so because the evidence upon which he relies does not contain information regarding every employee's race. For these reasons, the Court cannot find that Plaintiff has shown disparate ratings based on race.

*Promotable Candidates List.* There is evidence that Defendant Kersey was asked to develop a list of promotable candidates in 2000. Plaintiff was not informed about the list, and to Plaintiff's knowledge, Plaintiff was not included on the list. Plaintiff did not see the list, and there is no evidence as to whether any CDC employees, white or black, were included on the list or informed about it. For that reason, there is insufficient evidence to show that any exclusion of Plaintiff's name from the list was based on Plaintiff's race.

*P.O.S.T. Certification Issue.* There is evidence that Plaintiff received a letter in or around October 2002 informing him that his P.O.S.T. certification was in jeopardy due to the 2001 escape. There is also evidence that Plaintiff received this letter approximately one week after a white employee, Mr. Stoner, stopped by Plaintiff's home to drop off some paperwork and saw Richard Mack, a black employee who had filed a lawsuit against Defendant GDOC, visiting with Plaintiff. However, there is absolutely no evidence connecting these two events together. First, there is no evidence that Mr. Stoner told Defendant Kersey that he saw Mr. Mack at Plaintiff's

house.  Second, P.O.S.T. and GDOC are separate agencies, and there is no evidence that any GDOC employee had the authority, access, or influence to motivate P.O.S.T. to send Plaintiff such a letter. Third, there is no evidence that Defendant Kersey spoke with anyone at P.O.S.T. regarding Plaintiff's P.O.S.T. certification. Plaintiff's assertion that Defendant Kersey either knew or once worked with people in the P.O.S.T. office and therefore could have had something to do with the letter is pure conjecture.  And the fact that Plaintiff "found it strange" that the two events occurred within a relatively short time period is insufficient to create a genuine fact issue on this point.

*Phone Calls/Visit During FMLA Leave.*  There is evidence that Plaintiff took FMLA leave in the fall of 2002.  While Plaintiff was on leave, a GDOC employee hand delivered some FMLA paperwork to his home, and GDOC employees called Plaintiff regularly to find out how he was doing, to ask when he would complete and return the FMLA paperwork, and to determine when he would return to work.  There is no evidence that any of this alleged "harassment" was based on Plaintiff's race—there is no evidence that any similarly situated white employee who took indefinite FMLA leave was not given paperwork or contacted regularly with questions regarding his return date or the status of his FMLA paperwork.

*"Smile For You" Poster*.  There is evidence that there was a poster of a smiling gorilla with a poem called "Smile For You" on the bathroom door at the CDC.  The poster does not contain any racial slurs or symbols.  Plaintiff contends that the poster is racially

29

offensive because it contains a photograph of a gorilla.[24]   Standing alone, however, the poster appears to be benign.   There is no evidence of any racial motivation or racial message behind the hanging of the poster in this case:  there is no evidence as to which employee put up the poster, there is no evidence regarding the context or circumstances regarding the poster to indicate that the depiction of the gorilla was intended to be racially derogatory, there is no evidence of any comments or other reaction to the poster expressing a racially derogatory connotation, and there is no evidence that Plaintiff told anyone he thought the poster was racially offensive because of the gorilla picture.   Therefore, the Court cannot find that the posting of the "Smile For You" poster was based on race.

*Treatment of Residents.*  Plaintiff contends that black residents were treated differently than white residents and that this disparate treatment contributed to the racially charged environment at the CDC. Regarding Plaintiff's contention that white residents were treated more favorably than black residents in terms of discipline, release date, transportation, and visitation, there is not evidence of any black resident who was similarly situated in all relevant respects to a white resident who was treated differently.   As for the bulletin

---

[24]Plaintiff opines that any depiction of a primate is always racially derogatory in a "racially charged" environment.   The Court declines to adopt such a broad rule.   If the depiction of the primate itself or the circumstances surrounding the use of such a depiction demonstrate that the depiction is racially motivated, then it may be appropriate to find that the depiction is racially derogatory.   Such circumstances include the context of the depiction; who is responsible for its use; and any comments regarding or other reaction to the depiction. *Cf. Ash*, 126 S. Ct. at 1197 (finding that use of the word "boy" could be evidence of racial animus, depending on various factors, including context, inflection, tone of voice, local custom, and historical usage).

board of residents who failed the program, there is evidence that at one time the bulletin board contained four photographs of black residents who failed the program. At that time, it also contained a photograph of a white resident who failed the program. Plaintiff contends that although this one white resident was included on the bulletin board, "several" other white residents also failed the program but were not included on the board. There is no evidence regarding whether every black resident who failed the program was included on the bulletin board. There is no evidence regarding the failure rates of residents, and there is no evidence regarding how many residents—black or white—had photographs posted to the bulletin board over time. In sum, there is not enough evidence to determine that there was systemic disparate treatment with regard to the bulletin board postings. Therefore, the Court cannot find from the evidence in the record that there was disparate treatment in the bulletin board postings based on race.

### 2. Alleged Harassment Not Severe or Pervasive

The remaining alleged incidents of harassment are (1) the two comments by Officer Mitchell[25] and (2) the allegedly unpunished use, on one or two occasions and outside of Plaintiff's presence, of a racial slur by a white CDC resident against Richard Mack. Even assuming *arguendo* that these incidents were based on race, this conduct is not sufficiently severe or pervasive to create an objectively hostile work environment. In determining whether harassment objectively alters an employee's terms or conditions of

---

[25]The Court has some doubts regarding the sufficiency of the evidence to show that Officer Mitchell's comments—that Richard Mack was a "sorry son of a bitch" and Plaintiff was a "sorry joker"—were "based on" race.

31

employment, the following four factors are considered: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc). These factors may be met if racial slurs by co-workers are so "'commonplace, overt and denigrating that they create[] an atmosphere charged with racial hostility.'" *Edwards v. Wallace Cmty. College*, 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990)). However, in this case, the evidence only shows four offensive comments. Nothing in the record shows that the offensive comments occurred on a continuous basis, nor that they even lasted for a short and intense period. Rather, the evidence is that these four comments occurred randomly during Plaintiff's employment. This is not enough to meet the "severe or pervasive" requirement. Moreover, because there is no evidence that anyone in management had actual or constructive knowledge of Officer Mitchell's comments, there is no basis for holding Defendant GDOC liable for them. *See Watson*, 324 F.3d at 1259 (noting that when alleged harassment is created by co-workers, plaintiff must show that employer knew or should have known of harassment and failed to take immediate and appropriate corrective action).[26]

---

[26]Even if the two allegedly unpunished racial slurs by a white resident against Richard Mack *did* amount to severe or pervasive harassment of Plaintiff, Defendant GDOC is entitled to the *Ellerth/Faragher* affirmative defense. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Defendant GDOC satisfies prong one of the defense because it showed that it promulgated, and Plaintiff received, an anti-harassment policy listing the titles and

For all of these reasons, the Court finds that Plaintiff has failed to make out a prima facie case of hostile work environment racial harassment.  Therefore, Defendant GDOC is entitled to summary judgment on this claim.

### iv. Termination

Finally, Plaintiff claims that he was terminated in retaliation for filing an EEOC complaint and a Title VII lawsuit against Defendant GDOC.  To establish a prima facie case of retaliatory termination under Title VII, a plaintiff must show that (1) he engaged in statutorily protected activity, (2) he suffered an adverse employment action, and (3) there is some causal connection between the protected activity and the adverse employment action.  *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998).  In this case, there is no doubt that Plaintiff has satisfied the first two prongs:  he filed an EEOC complaint and a Title VII lawsuit against Defendant GDOC, and his employment was terminated.  The remaining question is whether there is a causal link between these events.  To prove a causal link, Plaintiff must demonstrate that the protected activity and the adverse action were not "wholly unrelated."  *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).  Because the Defendant GDOC contends that Plaintiff

---

phone numbers of a variety of people to whom complaints regarding harassment could be made, thus complying with *Faragher*'s minimum requirement of an effectively promulgated "complaint procedure designed to encourage victims of harassment to come forward [without requiring] a victim to complain first to the offending supervisor." *Walton v. Johnson & Johnson Services, Inc.* 347 F.3d 1272, 1286 (11th Cir. 2003).  Defendant GDOC satisfies prong two of the defense because it has shown that Plaintiff unreasonably failed to use GDOC's complaint procedure: he did not report the alleged harassment using the GDOC procedures, and there is no evidence that Plaintiff received any credible threat of retaliation to excuse his failure to report the alleged harassment. *See id.* at 1289-91.

was terminated for refusing to participate in an internal investigation which was sparked by documents produced by Plaintiff during his lawsuit, the Court assumes, *arguendo*, that Plaintiff has made out a prima facie case of retaliation.

Once a plaintiff makes out a prima facie case of retaliation, the employer may rebut it with a legitimate non-retaliatory reason for the challenged employment action. *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). In this case, Defendant GDOC has proffered a legitimate non-retaliatory reason for Plaintiff's termination: Plaintiff refused to cooperate in an internal investigation regarding the leak of confidential documents, and this refusal was a violation of Defendant GDOC's work rules punishable by termination. Because Defendant GDOC has proffered a legitimate non-retaliatory reason for Plaintiff's termination, to survive summary judgment Plaintiff has the burden to show that Defendant GDOC's proffered reason is pretext for retaliation. *Id.*

Plaintiff contends that Defendant's proffered reason is not the true reason for his termination. Disbelief of an employer's proffered reason, together with the employee's prima facie case, may be sufficient to support a finding of retaliation. *See Farley*, 197 F.3d at 1337. Therefore, if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact as to the truth of the employer's proffered reason, Plaintiff is entitled to survive summary judgment. *See id.* Here, Defendant GDOC has offered a "work rule" defense. Plaintiff may show that this defense is pretextual if he submits evidence that he did not violate the work rule or that a similarly situated employee who did not engage in protected conduct committed similar acts but was not terminated. *See*

*Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999).  This, Plaintiff has not done.

First, Plaintiff has not shown that Defendant GDOC's internal investigation regarding the document leak was a sham.  There is no evidence that the documents were not confidential or that the investigation was unwarranted.  Rather, there is evidence that Defendant Kersey believed that the documents were confidential and that a leak of such documents, which included private information regarding CDC employees and residents, was a serious matter. Furthermore, there is no evidence that Plaintiff was the only target of the investigation—the investigator interviewed a number of CDC employees.

Second, although Plaintiff argues that he did not refuse to cooperate in the investigation and that he was actually fired for refusing to talk with the investigator about his lawsuit, there is evidence that Defendant Kersey honestly believed that Defendant refused to cooperate in the investigation in violation of GDOC's policies and that Plaintiff was terminated for that reason.  When the internal investigator attempted to question Plaintiff regarding the document leak, Plaintiff stated that he would not talk about "his lawsuit."  Because the documents at issue in the investigation were produced by Plaintiff during his lawsuit, the investigator and Defendant Kersey reasonably concluded that Plaintiff's refusal to talk about his lawsuit constituted a refusal to talk about the documents.  Because the focus of the investigation *was* those documents and because it appeared to the investigator and Defendant Kersey that Plaintiff was refusing to talk about the documents, Defendant Kersey reasonably concluded that Plaintiff was refusing to

35

cooperate in the internal investigation.[27]   Therefore, Defendant Kersey had a reasonable, honest belief that Plaintiff violated a GDOC work rule by refusing to cooperate in an internal investigation.

Plaintiff's contention that he simply refused to talk about his lawsuit and did not refuse to cooperate in the internal investigation is without merit.   There is no evidence that the investigator or Defendant Kersey sought information about Plaintiff's lawsuit, such as how Plaintiff planned to rely on the documents.   Indeed, Plaintiff would have been completely justified in refusing to answer those types of questions, and such a refusal would not have constituted refusal to cooperate in an internal investigation.   However, the investigator had evidence, by virtue of Plaintiff's production of the documents during discovery, that Plaintiff or his attorney had somehow obtained confidential documents from the CDC without authorization.   Therefore, the investigator sought information as to how these documents came to be in the possession of Plaintiff or his attorney.   Questions on this topic would not be "about" Plaintiff's lawsuit.   Furthermore, such questions would not be impermissible because of Plaintiff's lawsuit—nothing about Plaintiff's lawsuit preempts GDOC's rules regarding confidentiality of documents or an employee's obligation to participate in an internal investigation regarding the leak of confidential documents.   Even if Plaintiff did not take the documents from the CDC himself, Defendant GDOC was entitled to question him about how he obtained them so it could

---

[27]Plaintiff knew that this was Defendant Kersey's conclusion.   After the first attempted interview, Defendant Kersey told Plaintiff that she believed he was refusing to cooperate in an internal investigation.

determine whether and how its confidentiality rules were violated.[28] However, Plaintiff completely preempted the investigation by flatly refusing to answer any question regarding "his lawsuit."   As discussed *supra*, based on that refusal, Defendant Kersey reasonably believed that Plaintiff was refusing to cooperate in the internal investigation.[29]

Finally, there is no evidence that a similarly situated white employee refused to cooperate in a similar internal investigation but was not terminated.

For all of these reasons, the Court finds that Plaintiff has not produced sufficient evidence to show that there is a genuine issue of fact on the truth of Defendant's proffered reason for terminating him.   Accordingly, Defendant GDOC is entitled to summary judgment on this claim.

   b. *Summary Judgment Motion of Defendants Kersey, Means, and Coleman*

Plaintiff's claims against Defendants Kersey, Means, and Coleman ("individual Defendants") in their individual capacities are based on alleged violations of § 1983.   To make a case under § 1983, Plaintiff must prove that the individual Defendants, under color of state law, deprived him of a right, privilege, or immunity secured

---

[28]To find otherwise would open a door to employers' confidential documents by enabling every employee with a Title VII claim against his employer to obtain such documents with impunity.

[29]Even assuming that Defendant Kersey was mistaken in believing that Plaintiff was refusing to cooperate in the investigation by stating that he would not talk about "his lawsuit," her reasonable, honest belief that Plaintiff did refuse to cooperate in the investigation prevents the Court from finding that there is sufficient evidence to show pretext on this point.  *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000) (noting that pretext is not demonstrated by showing that employer was under mistaken but honest impression that employee violated work rule).

by the Constitution or a federal law.  *See* 42 U.S.C. § 1983. Plaintiff contends that the individual Defendants violated his right to equal protection under the Fourteenth Amendment by discriminating against him based on his race with regard to his discipline, promotion, supervision, and termination.[30]  Plaintiff further claims that they violated his right to equal protection under the Fourteenth Amendment by creating a hostile work environment based on race.  The individual Defendants argue that they are entitled to qualified immunity on Plaintiff's § 1983 claims.

Qualified immunity shields public officers acting within the scope of their discretionary authority from liability so long as their acts do not violate clearly established law.  *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In determining whether qualified immunity applies, the courts use a two-part test.  First, the Court must determine whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  If this question is answered in the negative, there is no need for further inquiry. *Id.*  If, however, the evidence shows that the officer's conduct did violate a constitutional right, then the next step is to ask whether the right was clearly established.  *Id.*  Thus, the first question in

---

[30]The Court notes that pure retaliation is not actionable under the Equal Protection Clause.  *See Watkins v. Bowden*, 105 F.3d 1344, 1354-55 (11th Cir. 1997).  Because the Court finds that the individual Defendants are entitled to qualified immunity on Plaintiff's termination claim, assuming it *was* a valid § 1983 claim, the Court does not reach the question whether Plaintiff sufficiently alleged that his termination was based on his race *and* his protected activity such that the termination claim can constitute part of Plaintiff's equal protection claim.

this case is whether the evidence, viewed in the light most favorable to Plaintiff, demonstrates that the individual Defendants violated Plaintiff's right to equal protection.

To establish a violation of the Equal Protection Clause, Plaintiff must prove discriminatory intent or purpose. *Cross v. Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995). When § 1983 is used as a parallel remedy for Title VII violations, the elements of the two causes of action are the same, and identical methods of proof are employed. *See Richardson v. Leeds Police* Dep't, 71 F.3d 8081, 805 (11th Cir. 1995); *see also Cross*, 49 F.3d at 1507-08. In addition, the same five elements to establish a prima facie case of hostile work environment under Title VII are required to establish a hostile work environment claim under § 1983. *See Cross*, 49 F.3d at 1508. As discussed *supra*, Plaintiff has not presented sufficient evidence to demonstrate a genuine issue of material fact as to whether the individual Defendants discriminated against him based on his race with regard to his discipline, promotion, supervision, or termination, and he has not shown that the allegedly harassing conduct was either based on race or sufficiently severe or pervasive to create a hostile work environment. Therefore, the Court concludes that Plaintiff has not met his burden of showing that the individual Defendants' conduct violated a constitutional right, and there is no need to determine whether the right was clearly established. *See Saucier*, 533 U.S. at 201. Accordingly, the individual Defendants are entitled to qualified immunity, and the Court grants their Motion for Summary Judgment.

CONCLUSION

Defendant GDOC's Motion for Summary Judgment is granted.  The Motion to Dismiss and Motion for Summary Judgment filed by Defendants Kersey, Means, and Coleman is also granted.

IT IS SO ORDERED, this 14th day of April, 2006.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE